UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASETEK DANMARK A/S,<br><br>Plaintiff,<br><br>v.<br><br>CMI USA, INC.,<br><br>Defendant. | Case No.  13-cv-00457-JST<br><br>**ORDER DENYING DEFENDANT'S POST-TRIAL MOTIONS; GRANTING IN PART AND DENYING IN PART PLAINTIFF'S POST-TRIAL MOTIONS**<br><br>Re: ECF Nos. 266, 267, 269 |

This patent infringement case was tried to a jury in December 2014.  ECF No. 189.  On December 17, 2014, the jury returned a verdict in favor of Plaintiff Asetek Danmark A/S ("Asetek"), finding that Defendant CMI USA, Inc. ("CMI")'s products infringed United States Patents Nos. 8,240,362 and 8,245,764 ("'362 patent" and "'764 patent").  ECF Nos. 218, 219.

Now before the Court are three sets of post-judgment motions:  (1) CMI's motions for entry of judgment as a matter of law under Federal Rule of Civil Procedure 50(b)(3) and for a new trial under Federal Rule of Civil Procedure 50(b)(2) or 59 (ECF No. 269); (2) Asetek's motion for entry of a permanent injunction (ECF No. 266); and (3) Asetek's motion for supplemental damages and prejudgment interest (ECF No. 267).  For the reasons set forth below, the motion for entry of judgment as a matter of law is denied, the motion for a new trial is denied, the motion for entry of permanent injunction is granted, and the motion to alter the judgment is granted in part and denied in part.

## I.       BACKGROUND

Asetek is a Denmark-based corporation that sells liquid cooling systems for data centers, servers, workstations, and personal computers.  ECF No. 1, ¶¶ 1, 11, 12.  It owns the '764 and '362 patents by assignment.  ECF No. 118 at 1.  The patents relate to devices that use liquid to cool computer components.  See ECF No. 1, Exs. A, B.

On January 31, 2013, Asetek filed suit against CMI for infringement of claims 14, 15, and 17-19 of the '362 patent, and claims 1-15, 17, and 18 of the '764 patent, by the following CMI products: (1) Cooler Master Seidon 120M, 120XL, and 240M; (2) Cooler Master Seidon 120V and 120V Plus; (3) Cooler Master Glacer 240L; and (4) Cooler Master Nepton 140XL and 280L. ECF No. 1; ECF No. 130 at 1.  In its complaint, Asetek "demand[ed] a jury trial on all matters triable to a jury."  ECF No. 1 at 7.

### A.   Claim construction

This case was consolidated for claim construction with another patent-infringement suit brought by Asetek involving the '362 and '764 patents.  See ECF No. 35 at 1 & n.1.  Judge Edward M. Chen presided over the joint claim construction proceeding.  Id.  Judge Chen's claim construction order addressed several terms relating to the claims in dispute at trial.  See id.  Judge Chen declined to construe the term "substantially circular passages," and instead adopted the plain and ordinary meaning of that term.  Id. at 12-14. The parties did not include the term "removably attached" or "removably coupled" in their joint claim construction statement, and Judge Chen did not construe them.  See ECF Nos. 31, 35.

### B.   Summary judgment

CMI then moved for summary judgment of invalidity of the '362 and '764 patents and non-infringement of the '362 patent.  ECF No. 86.  CMI argued that the '362 and '764 patents were invalid as both anticipated and obvious.  See ECF Nos. 86, 106.  Genuine issues of material fact prevented the Court from determining whether CMI's products met the "reasonably attached/coupled" limitation.  ECF No. 126 at 14.  The Court also determined that the terms "removably coupled" and "removably attached" did not require construction, because they would not be unfamiliar or confusing to a jury.  Id. at 14 n.6.  The Court denied CMI's motion for summary judgment in full.

### C.   Pre-trial and trial

The matter then proceeded to trial.  In the parties' joint pre-trial statement, CMI stated that it contested infringement only of the '362 patent, and not of the '764 patent.  See ECF No. 130 at

United States District Court
Northern District of California

United States District Court
Northern District of California

4-5.  CMI also asserted that the '764 and '362 patents were invalid as anticipated, obvious, and indefinite, and because they lacked adequate written descriptions.  See id.

Jury selection began on December 2, 2014.  On December 17, 2014, the jury returned a verdict in Asetek's favor.  ECF No. 219.  The jury found that all of the accused products infringed the claims of the '362 patent, and that CMI's products contributorily infringed the asserted method claims of the '362 patent.  Id. at 1-2.  The jury also found that the '764 patent was not invalid as anticipated by the Koga prior art reference.[1]  Id. at 2.  The jury also rendered several decisions related to the question of obviousness.  First, the jury found that a person of ordinary skill in the field of liquid cooling at the time of the inventions claimed in the '764 and '362 patents was:

> [S]omeone who has completed college level course work in thermodynamics, fluid mechanics, and heat transfer, and would have two or more years of experience in designing liquid cooling systems for computers or very similar technology or one with a more advanced degree in the above fields [who] may have had less practical experience.

Id. at 3.  Second, the jury described the scope and content of the prior art at the time of the claimed invention as follows:

> The prior art devices included a pump, a single-chamber reservoir (as that term was used in the prior art), and a cold plate as separate components that were connected using tubing or attached together with clips or screws or perm[an]ently coupled.  Certain prior art devices had a pump and a cold plate incorporated into a single swirl chamber, which provided no separation between the pumping and the heat exchange functionalities of the liquid cooling device.

Id.  Third, the jury determined the differences that existed between the claimed invention and the prior art at the time of the invention.  The differences included:

> Asetek's patented invention is directed to a closed loop liquid cooling system in which cooling liquid is pumped continuously between a pump head and a heat radiator (positioned remote from the pump head).  Rather than connecting together multiple separate components (as in the prior art), Asetek's patented pump head design combines, into a single unit, a pump and the claimed "reservoir" that has, among other things, dual chambers and is

---

[1] The parties do not dispute that U.S. Patent  No. 7,554,049 to Koga et al. ("Koga"), Korean Patent No. 20-0314041 to Ryu ("Ryu"), and U.S. Publication No. 2004/0052663 to Laing et al. ("Laing") are prior art to Asetek's patents.  ECF No. 235 at 4; ECF No. 236 ¶¶ 19-27.

United States District Court
Northern District of California

1
2
3
4

> bounded by a removable cold plate.  Also, the claimed "reservoir" in Asetek's invention is a single receptacle that is divided into an upper chamber and a lower chamber, with the upper chamber providing the pumping function and the lower chamber providing the thermal exchange function.  In addition to providing efficient heat removal, Asetek's patented invention includes at least one of the following benefits over each example of prior art: a compact (narrow) profile, cost-effective manufacturing, and reduced risk of fluid leakage.

5   Id. at 4.  Finally, the jury found that Asetek established all objective indicia of non-obviousness

6   that Asetek sought to prove at trial, including: (1) "commercial success of [the] product[s] due to

7   the merits of the claimed invention"; (2) "a long-felt need for the solution that is provided by the

8   claimed invention"; (3) "unsuccessful attempts by others to find the solution that is provided by

9   the claimed invention"; (4) "copying of the claimed invention by others"; (5) "unexpected and

10  superior results from the claimed invention"; and (6) "acceptance by others of the claimed

11  invention as shown by praise from others in the field or from the licensing of the claimed

12  invention."  Id.

13          The jury also determined that Asetek was entitled to $404,941 in damages, representing a

14  14.5% royalty rate on CMI's sales of infringing products.  ECF No. 219 at 5.

15          **D.      Post-trial**

16          On January 26, 2015, CMI filed its proposed findings of fact and conclusions of law, as

17  well as its memorandum of points and authorities in support of its defenses.  ECF Nos. 234, 235.

18  On February 9, 2015, Asetek filed its responsive proposed findings of fact and conclusions of law.

19  ECF No. 236.

20          On April 21, 2015, the Court issued its findings of fact and conclusions of law, ECF No.

21  249.  The Court concluded that CMI failed to show by clear and convincing evidence that the '362

22  and '764 patents were invalid for obviousness, lack of written description, or indefiniteness.  CMI,

23  in a post-trial brief, argued that the term "substantially circular passages" was indefinite.  See ECF

24  No. 234 at 15-16.  But the Court found that CMI waived its indefiniteness defense by not pursuing

25  it at trial.  ECF No. 249 at 28.  The Court also noted that CMI did not raise the argument that the

26  term "removably attached" was indefinite in its post-trial briefing, and that CMI could not

27  properly pursue the issue at trial.  Id.

28

4

The parties have now filed various post-trial motions, including CMI's renewed motion for judgment as a matter of law and motion for a new trial, and Asetek's motion for a permanent injunction and motion for supplemental damages.

## II.     CMI'S MOTION FOR ENTRY OF JUDGMENT AS A MATTER OF LAW

On June 30, 2015, CMI filed its renewed motion for judgment as a matter of law and motion for a new trial.  ECF No. 269.  CMI argues that the non-infringement should be granted as a matter of law because the accused products do not infringe the '362 patent as a matter of law and consequently, do not contributorily infringe, and that substantial evidence does not support the jury's finding of a 14.5% royalty rate.  See id.

### A.     Legal standard

Under Federal Rule of Civil Procedure 50, "a party must make a Rule 50(a) motion for judgment as a matter of law before a case is submitted to the jury.  If the judge denies or defers ruling on the motion, and if the jury then returns a verdict against the moving party, the party may renew its motion under Rule 50(b)."  E.E.O.C. v. Go Daddy Software, Inc., 581 F.3d 951, 961 (9th Cir. 2009).  In considering a renewed motion for judgment as a matter of law, under Rule 50(b)(3), the court must uphold the jury's verdict if "substantial evidence" supports the jury's conclusion.  Johnson v. Paradise Valley Unified Sch. Dist., 251 F.3d 1222, 1227 (9th Cir. 2001).[2]  "Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence."  Id.  The court must "view all the evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in the favor of the nonmover, and disregard all evidence favorable to the moving party that the jury is not required to believe."  Castro v. Cnty. of Los Angeles, 785 F.3d 336 (9th Cir. 2015); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000).  Judgment as a matter of law "is appropriate when the jury could have relied only on speculation to reach its verdict."  Lakeside-Scott v. Multnomah Cnty., 556 F.3d 797, 803 (9th Cir. 2009).

---

[2] In reviewing motions for judgment as a matter of law, the Federal Circuit applies the law of the regional circuit in which the district court is located.  See, e.g., Enovsys LLC v. Nextel Commc'ns, Inc., 614 F.3d 1333, 1341 (Fed. Cir. 2010).

United States District Court
Northern District of California

United States District Court
Northern District of California

**B.      Analysis**

     **1.      The jury's determination that CMI's products meet the "removably attached" limitation**

CMI contends that the accused products do not infringe the '362 patent as a matter of law because the products do not meet the "reasonably attached" or "reasonably coupled"[3] limitations. ECF No. 269 at 3.  Claim 14 requires "the heat exchanging interface" to be "removably attached to the reservoir," while claim 17 requires "the heat exchanging interface" to be "removably coupled to the reservoir."  All of the asserted claims of the '362 patent contain the structural limitation between the heat exchanging interface and the reservoir because Claim 15 depends on Claim 14 and Claims 18 and 19 depend on Claim 17.  The jury found that the Seidon, Seidon 120V, Nepton, and Glacer 240L infringed all claims of the '362 patent, including claims 14 and 17.  See ECF No. 219 at 1.

     **a.      Standard of review**

CMI and Asetek disagree as to the legal standard the Court should apply in reviewing the jury's finding of infringement.  CMI argues that the Court should review the jury's verdict *de novo*, because "there is no material dispute regarding the operation of the accused products" and "[i]nfringement instead turned on applying the ordinary meaning of the 'removably attached' and 'substantial circular passageway' limitations."  ECF No. 269 at 9 (citing MyMail, Ltd. v. Am. Online, Inc., 476 F.3d 1372 (Fed. Cir. 2007) and K-2 Corp. v. Salomon S.A., 191 F.3d 1356 (Fed. Cir. 1999)).  Asetek argues that the question of CMI's infringement is a factual question that must be reviewed "for substantial evidence."  ECF No. 286 at 10 (quoting Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1301 (Fed. Cir. 2011)).

MyMail and K-2 do not assist the Court.  In those cases, the trial courts had construed disputed patent terms and granted summary judgment of non-infringement, requiring the Federal Circuit to resolve issues of claim interpretation on appeal.  See MyMail, 476 F.3d at 1375; K-2

---

[3] Both parties use the terms "removably attached" and "removably coupled" interchangeably.  See ECF No. 269 at 2 n.2; ECF No. 286 at 5 n.3.

1    Corp., 191 F.3d at 1362.  Here, the term "removably attached" was not disputed during claim

2    construction,[4] and it was not until its reply brief in support of summary judgment that CMI

3    suggested to the Court that the term be construed.[5]  CMI made no mention of the term in its

4    pretrial filings and did not seek to construe the term in its proposed jury instructions.  ECF No.

5    205 at 4; see Hewlett-Packard Co. v. Mustek Sys., Inc., 340 F.3d 1314, 1320-21 (Fed. Cir. 2003)

6    (where the parties and district court elect to provide the jury only with the claim language itself, "it

7    is too late at the JMOL stage to argue for or adopt a new and more detailed interpretation of the

8    claim language and test the jury verdict by that new and more detailed interpretation").  Thus, this

9    Court tests the jury's verdict under the plain meaning of "removably attached," see id. at 1320

10   ("On JMOL, the issue here should [be] limited to the question of whether substantial evidence

11   supported the verdict under the agreed instruction"), and examines whether substantial evidence

12   supports the jury's conclusion that CMI's products infringe the '362 patent under the plain

13   meaning of the "removably attached" limitation.

14               **b.       Ordinary meaning of the terms**

15         CMI argues that the jury erred in applying the "removably coupled" and "removably

16   attached" limitations, because whatever plain meaning the jury applied was at odds with the

17   definition given to the term "removably attached" in another case involving children's car seats.

18   Dorel Juvenile Group, Inc. v. Graco Children's Prods., 429 F.3d 1043 (Fed. Cir. 2005).

19         In Dorel, the Federal Circuit vacated a grant of summary judgment of non-infringement

20   and remanded the case to the district court to determine, as a matter of fact, whether the accused

21   child's car seat met the limitations of the asserted claims.  Id. at 1047.  The accused product

22   consisted of two plastic parts: the top portion where the child sat and the bottom base upon which

23

24   _____

     [4] Although CMI originally requested that the Court construe the term "removably coupled," ECF
25   No. 107 at 2, 107-3 at 3, it dropped that request in the parties' Joint Claim Construction and
     Prehearing Statement filed with the Court.  ECF No. 31.  Thereafter, CMI did not request
26   construction of the term "removably attached" at all.

27   [5] CMI suggested in its reply brief that the Court should construe the "removably attached"
     limitation so as not to cover the accused products secured with security screws with triangular
28   heads.  See ECF No. 106 at 14-15.

United States District Court
Northern District of California

United States District Court
Northern District of California

1 the seat fit. Id. at 1045. The base was "removably attached and arranged to support the seat," and

2 the pieces were held together by screws, either "of the ordinary variety" or "one-way screws." Id.

3 In giving the ordinary meaning to the terms "removably attached" and "removably secured," the

4 district court concluded that the "claimed product is designed to come apart." Id. And the seat

5 and base did not need to come apart during normal usage or be easily removed. Id. at 1045. To

6 the district court, the "removable" limitations therefore meant that "[t]he seat and base can be

7 separated 'in a manner that contemplates that the seat may be removed from the base such that the

8 seat remains functional.'" Id. at 1046. The Federal Circuit held that the district court correctly

9 interpreted the contested "removable" limitations as understood through the plain meaning of the

10 claim language and "as tested by information in the specification." Id.

11  CMI argues that the Court should have construed the "removably" limitations of Asetek's

12 patents to require that the product "remain functional," just as the Dorel court did, and having not

13 done so, should now correct what it perceives to be the jury's error. CMI argues that its products

14 are not designed to come apart during the products' lifetime and doing so would render the

15 products unusable; thus, no reasonable jury could think the "removably attached" limitation

16 applied. ECF No. 269 at 8-10.

17  CMI's argument[6] rests on a faulty premise: that a term that has a plain meaning in one

18 context has the same plain meaning in all others. In fact, however, the opposite is true – the words

19 of a claim are construed in the context of *that claim* and *that patent* as a whole. World Class Tech.

20 Corp. v. Ormco Corp., 769 F.3d 1120, 1123 (Fed. Cir. 2014). "We apply . . . the principle that

21 '[t]he construction that stays true to the claim language and most naturally aligns with the patent's

22 description of the invention will be, in the end, the correct construction.'" In re Papst Licensing

23 Digital Camera Patent Litig., 778 F.3d 1255, 1261 (Fed. Cir. 2015) (quoting Renishaw PLC v.

24 Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998). Thus, our courts have been

25 careful to construe the terms of a patent in the context of that patent. E.g., In re Katz Interactive

26 Call Processing Patent, No. 07-CV-2134, 2012 WL 10997174, at *2 (C.D. Cal. Apr. 26, 2012);

27

28 [6] CMI never cited Dorel at any time prior to entry of judgment.

I-Flow Corp. v. Apex Med. Technologies, Inc., No. 07CV1200 DMS (NLS), 2008 WL 2899822, at *4 (S.D. Cal. July 25, 2008); Hilleby v. FMC Corp., No. C-91-568 FMS, 1992 WL 455435, at *4 (N.D. Cal. July 28, 1992).  And a word that has a certain plain meaning in one context can have a different plain meaning in another context.[7]  A child's car seat works differently from a liquid cooling device for a computer.

CMI points to nothing in the language of the patent requiring that the product be functional once the cooling plate is removed, and there is nothing in the words "removably attached" that themselves remotely suggest such a construction.  Even Dorel explains that the ordinary meaning term "removably attached" is that the two joining parts are "capable of separation" or "designed at some time or another to come apart."  See id. at 1045-46.  The Court will continue to apply the plain and ordinary meaning of the term.  The plain language of the claim counsels against the narrow interpretations proposed by CMI.  See Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) ("[T]he words of a claim 'are generally given their ordinary and customary meaning' . . . that the term would have to a person of ordinary skill in the art in question at the time of the invention.").

### c.      Substantial evidence supports the jury's verdict

The Court concludes that substantial evidence supports the jury's conclusion that the accused products infringed the '362 patent with the "removably attached" limitation.  At trial, Asetek's expert, Dr. David Tilton testified that the thermal-exchange interface was attached to the reservoir in a way that is removable.  ECF No. 198 (Transcript 12/08/2014) 646:7-10.  Dr. Tilton stated that for each product, the thermal exchange interface could be removed by taking out the

---

[7] There is nothing groundbreaking about the observation that meaning depends on context.  When Raymond Chandler and J.D. Salinger each use the word "grand", its meaning is plain to the reader, even though it means something very different in each context.  Compare Raymond Chandler, "Blackmailers Don't Shoot," Black Mask, Dec. 1933 ("The letters will cost you ten grand, Miss Farr.") with J.D. Salinger, The Catcher In The Rye 9 (1951) ("Then he said, 'I had the privilege of meeting your mother and dad when they had their little chat with Dr. Thurmer some weeks ago.  They're grand people.'").  A claim term's ordinary meaning also depends on context.  See Biogen Idec, Inc. v. GlaxoSmithKline LLC, 713 F.3d 1090, 1095 (Fed. Cir. 2013) ("[A] term's ordinary meaning must be considered in the context of all the intrinsic evidence, including the claims, specification, and prosecution history.").

1    screws, thus concluding that the "removably attached" limitation applied to all of the accused

2    products.  See Tr. 622:19-22 (narrating the removal of the interface on the Seidon 120M), 627:24-

3    25 (narrating the removal of the interface on the Seidon 120V), 629:5-10 (narrating the removal of

4    the interface on the Glacer 240L), and 631:21-25 (narrating the removal of the interface on the

5    Nepton 140XL).  As Dr. Tilton testified with regard to CMI's Seidon 120M product:

6           **Q.** So here we see the screw being removed. Is that right?

7           **A.** Yeah. You just taken the last screw out so that we can take the
             thing apart. And you can see the interior features. So this is the
8           thermal-exchange interface. And it's removable, as required by the
             claims. It's coming off of the device.
9

10   Tr. 622:18-623:22.  Dr. Tilton went on to explain that he had also personally removed screws from

11   the accused products, including products using triangular-head screws, using commercially

12   available screwdrivers.  Tr. 646:22-647:19.  Dr. Tilton then concluded that the Seidon products

13   and the Glacer 240L infringed on Claim 14 of the '362 patent.  See Tr. 658:3-6.  Dr. Tilton also

14   concluded that the Seidon 120V and the Nepton products met the limitation of Claim 17.  See Tr.

15   666:3-17.

16          CMI's expert, Dr. Gregory Carman, disagreed that the "removably attached" limitation

17   was met by all of CMI's products.  However, during cross-examination, Dr. Carman agreed that

18   he was able to remove the thermal exchange interfaces from the accused products.  See ECF No.

19   200 (Transcript 12/09/2014) 819:10-24.  For example, he testified:

20          **Q.** Okay. The claim doesn't say anything about the means by which
             the cold plate can be removed. It simply says "removable"; right?
21

22          **A.** That is correct.

23          **Q.** And you were able to remove all the cold plates; right?

24          **A.** That is correct.

25   Tr. 820:23-821:3.

26          The jury considered this testimony, and credited it.  The Court concludes that substantial

27   evidence supports the jury's findings that the accused products meet the "removably attached" and

28

"removably coupled" limitations.

## 2.     The jury's determination that CMI's products meet the "substantially circular passageway" limitation

Next, CMI contends that its products do not infringe the '362 patent as a matter of law because the products do not meet the "substantially circular passageway" limitation.  Claim 14 recites that the upper and lower chamber of the reservoir be "fluidly coupled together by one or more passageways, at least one of the one or more passageways being a *substantially circular passageway* positioned on the horizontal wall . . . ." (emphasis added).  Claim 15 depends on Claim 14.  During claim construction, the Court adopted the plain and ordinary meaning of the term.  See ECF No. 35 at 12-13.  At trial, the jury found that the Seidon products and the Glacer 240L infringed Claims 14 and 15.  See ECF No. 219 at 1.

CMI contends that because Asetek alleged only literal infringement, and not infringement under the doctrine of equivalents, the limitation must read exactly on CMI's products.  See DeMarini Sports, Inc. v. Worth, Inc., 239 F.3d 1314, 1331 (Fed. Cir. 2001) ("Literal infringement of a claim occurs when every limitation recited in the claim appears in the accused device, i.e., when 'the properly construed claim reads on the accused device exactly.'").  CMI points out that its products have "fan-shaped" passageways, none of which by itself is "substantially circular." ECF No. 269 at 11.  CMI contends that because none of its accused devices have at least *one* singular passageway that is "substantially circular," no reasonable jury could find that the CMI products literally met the "substantially circular passageway" limitation.  Id.

At trial, however, the jury heard Dr. Tilton testify that the passageway was still substantially circular, even though the ribs divide it into several "sections" or "segments":

> **Q.** So is it fair to say that in your opinion, those are three different segments of a substantially -- a single, substantially circular passageway?
>
> **A.** Well, yeah. There's one passage there. It's the passage where the fluid goes from this chamber up into the impeller.

ECF No. 198 (Transcript 12/08/2014) 643:18-22.  Dr. Tilton testified that the passageway was "obviously substantially circular" with only "a couple of ribs dividing." Tr. 642:11-12.  He also

1    explained that the fluid could only enter properly through a substantially circular passageway,

2    otherwise the pump would not function properly.  Tr. 642:20-13.  Specific to the Glacer 240L, Dr.

3    Tilton agreed that in the product had a "perfectly circular . . . lower half, but . . . does have the ribs

4    in . . . the exit point in the upper half."  Tr. 645:13-16.

5            CMI's motion must be denied, because there is sufficient evidence that supports the jury's

6    verdict of infringement.  See Johnson, 251 F.3d at 1227 (9th Cir. 2001).

### 3.    The jury's determination that CMI was liable for contributory infringement

9            Next, CMI argues that the evidence was insufficient to support the jury's finding that it

10   contributorily infringed the '362 patent.[8]  CMI now makes the same motion again.

11           "In order to succeed on a claim of contributory infringement, in addition to proving an act

12   of direct infringement, plaintiff must show that defendant 'knew that the combination for which its

13   components were especially made was both patented and infringing' and that defendant's

14   components have 'no substantial non-infringing uses.'"  Cross Med. Prods., Inc. v. Medtronic

15   Sofamor Danek, Inc., 424 F.3d 1293, 1312 (Fed. Cir. 2005) (quoting Golden Blount, Inc. v.

16   Robert H. Peterson Co., 365 F.3d 1054, 1061 (Fed. Cir. 2004)).  Once the plaintiff makes a prima

17   facie showing that defendant's product is not suitable for substantial non-infringing use, the

18   burden of demonstrating a non-infringing use shifts to the defendant.  Golden Blount, 438 F.3d at

19   1363.

20           CMI first argues that because CMI products did not directly infringe the '362 patent, CMI

21   could not contributorily infringe.  ECF No. 269 at 13.  CMI also argues that it did not commit

22   contributory infringement because no reasonable jury could find that CMI had knowledge that its

23   products infringed Asetek's patents.  Id.

24           As discussed previously, substantial evidence supports the jury's conclusion that CMI

25   directly infringed the '362 patent.  As to CMI's knowledge of Asetek's patents and CMI's own

---

[8] CMI orally moved at trial for a directed verdict on Asetek's contributory infringement claim.
See ECF No. 213 (Transcript 12/15/2014) 1482:16-1485:25.  The Court denied CMI's motion,
finding that Asetek submitted sufficient evidence on its contributory infringement claim from
which a reasonable jury could find in Asetek's favor.  ECF No. 232 at 4.

United States District Court
Northern District of California

infringement of them, Asetek sent a case-and-desist letter to CMI on November 28th, 2012 accusing CMI's products of infringing Asetek's patents.  See Tr. 1490:3-12 (Trial Exhibit 372).  A reasonable jury could conclude that CMI had knowledge of its infringement from that day forward.  As to whether defendant's components have no substantial non-infringing use, Dr. Tilton testified that CMI's products infringed Asetek's patents and that the products had no non-infringing uses.  ECF No. 198 (Transcript 12/8/14) 669:4-7, 672:5-9.  CMI's General Manager, Danny Chen, also testified that CMI sells its products with instruction manuals showing purchasers how to install CMI products so as to provide liquid cooling for computers, i.e., in a manner that infringes on Asetek's patents.  See ECF No. 203 (Transcript 12/11/14) 1078:11-14, 1094:7-1095:16.  The "instructions packaged with each device teach the infringing configuration and nothing in the record suggests that . . . any end-user ignored the instructions or assembled the [products] in a manner contrary to the instructions so as to form a non-infringing configuration."  Golden Blount, 438 F.3d at 1363.

Substantial evidence supports the jury's conclusion that CMI is liable for contributory infringement.

### 4.      The 14.5% royalty rate

Finally, CMI argues evidence does not support the jury's finding of a 14.5% royalty rate and the damages award of $404,941 based on that award.  ECF No. 269 at 13.  CMI and Asetek dispute whether Asetek's expert, Dr. Nisha Mody, performed a proper reasonable royalty analysis.

Upon a finding of infringement, the patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."  35 U.S.C. § 284; see also Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1554 (Fed. Cir. 1995) (en banc).  When a patentee is unable to prove entitlement to lost profits or an established royalty rate, "it is entitled to 'reasonable royalty' damages based upon a hypothetical negotiation between the patentee and the infringer when the infringement began."  Unisplay, S.A. v. Am. Elec. Sign Co., 69 F.3d 512, 517 (Fed. Cir. 1995).  "This hypothetical construct seeks the percentage of sales or profit likely to have induced the hypothetical negotiators

1   to license use of the invention." Minco, Inc. v. Combustion Eng'g, Inc., 95 F.3d 1109, 1119

2   (Fed.Cir.1996).  A reasonable royalty is determined by examining the factors set forth in Georgia-

3   Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970), which are:

4   (1) royalties the patentee receives for licensing the patent in suit, (2) rates the licensee pays for

5   other comparable patents, (3) the exclusivity and restriction terms, (4) the Licensor's policy to

6   maintain patent monopoly by not licensing the invention to others, (5) the commercial relationship

7   between the two parties, (6) effect of selling the patented specialty in promoting sales of other

8   products, (7) duration of patent and term of license, (8) established profitability of the products

9   made under the patent, (9) advantages of the patented component over old components, (10) the

10  nature of the patented invention, (11) the extent to which the infringer has used the invention, (12)

11  the portion of profit customarily allowed for use of the invention, (13) the portion of profit

12  attributable to the invention, (14) expert testimony, and (15) outcome from hypothetical arm's

13  length negotiation at the time of infringement.  Id. at 1119-20.

14      Although this analysis "necessarily involves an element of approximation and uncertainty,

15  a trier of fact must have some factual basis for a determination of a reasonable royalty."[9]

16  Unisplay, 69 F.3d at 517.  The amount of damages based on a reasonably royalty is an issue of

17  fact, and the jury's damages award is reviewed under the substantial evidence standard.  See

18  Micro Chemical, Inc. v. Lextron, Inc., 317 F.3d 1387.

19      Asetek's expert, Dr. Mody, calculated a reasonable royalty rate of 16% but found the

20  effective rate to be between 10% and 19%.  ECF No. 200 (Transcript 12/09/2014) Tr. 854:8-12,

21  862:24-863:2.  Dr. Mody testified that she used the Georgia-Pacific factors in determining the

22  reasonable royalty rate, and identified to the jury how the various factors applied to the products

23  and patents at issue.  Tr. 854:13-863:6.  Dr. Mody started by looking at the patent license

24

25  [9] Not all Georgia-Pacific factors are relevant to any particular hypothetical negotiation.
    Gargoyles, Inc. v. United States, 37 Fed. Cl. 95, 103 aff'd, 113 F.3d 1572 (Fed. Cir. 1997);
26  Damien Geradin, The Meaning of "Fair and Reasonable" in the Context of Third-Party
    Determination of FRAND Terms, 21 GEO. MASON L. REV. 919, 949 (2014) ("not all of the
27  Georgia-Pacific factors will be relevant to every question regarding the fairness and
    reasonableness of proffered license terms").  These factors are not prioritized and may overlap.
28  See ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 869 (Fed. Cir. 2010).

United States District Court
Northern District of California

agreement between Asetek and Corsair and took into account the value Asetek attributed to its intellectual property through the license.  Tr. 856:21-858:5.  Dr. Mody also looked at the benefits incorporated into the agreement, which included not only a royalty on products covered by Asetek's patents, but also purchases from Asetek directly.  Based on that analysis, she concluded that a reasonable royalty would be in the range of 10% to 19%.  Tr. 858:15-859:5; 865:24-866:4.  Dr. Mody then testified that 14.5% is the middle of the range, and that certain Georgia-Pacific factors would pull the royalty rate below or above the midpoint, such as whether Asetek held a patent monopoly and the competitive relationship between Asetek and CMI.  Tr. 866:8-869:1 (discussing Georgia-Pacific factors 3, 4, and 5).  Dr. Mody also discussed how Asetek and CMI's commercial success affected her analysis.  Tr. 872:3-873:5.

Dr. Mody also testified that it would not be practical to make Asetek's business relationship with Corsair equivalent to Asetek's business relationship with CMI because CMI competes with Asetek, whereas Corsair does not.  Tr. 857:10-871:21.  Dr. Mody then testified that a reasonable royalty rate would be higher at the hypothetical negotiation between Asetek and CMI because of this competitive relationship.  Tr. 882:2-16.  Overall, Dr. Mody concluded that a reasonable royalty rate would be 16%.  Tr. 854:8-12.

CMI argues that instead of properly applying the Georgia-Pacific factors, Dr. Mody computed a "pseudo lost profits analysis."  ECF No. 269 at 10.  CMI's expert, James Pampinella, testified that Dr. Mody misapplied the Georgia-Pacific factors and made faulty assumptions in arriving at her royalty rate figure.  See, e.g., Tr. 972:19-973:6 ("She's basically implicitly assuming a lost-profits claim in that analysis.").  Mr. Pampinella also described his own analysis for the reasonable royalty rate he calculated starting with the Corsair license and applying the Georgia-Pacific factors. Tr. 933:14-939:8.  Mr. Pampinella concluded that Asetek would have agreed to license with a 4.5% royalty rate.  Tr. 923:14-15.

The jury weighed both experts and found that Asetek proved it was entitled to a reasonable royalty rate of 14.5%.  Dr. Mody's testimony, and her discussion of the application of the Georgia-Pacific factors, provided sufficient evidence to support the jury's royalty rate.

The Court denies CMI's motion for entry of judgment as a matter of law.

## III.   CMI'S MOTION FOR A NEW TRIAL

CMI also argues that a new trial is warranted because the Court made several clearly erroneous findings of fact predicate to rejecting CMI's invalidity defenses, and because certain jury instructions unfairly prejudiced CMI.

### A.   Legal standard

Under Federal Rule of Civil Procedure 50(b)(2) a new trial may be granted if there is not a "legally sufficient evidentiary basis" for the verdict.  The district court has discretion to order a new trial rather than grant judgment as a matter of law.  See Cone v. West Virginia Pulp & Paper Co., 330 U.S. 212, 215 (1947).

Under Federal Rule of Civil Procedure 59(a)(1), a court "may, on motion, grant a new trial on all or some of the issues."  A court may grant a new trial "if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice."  Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007).  A judge should not grant a new trial unless she "is left with the definite and firm conviction that a mistake has been committed."  Landes Constr. Co. v. Royal Bank of Canada, 833 F.2d 1365, 1371-72 (9th Cir. 1987) (internal citations omitted).  In considering a Rule 59(a) motion for a new trial, the Court "is not required to view the trial evidence in the light most favorable to the verdict.  Instead, the district court can weigh the evidence and assess the credibility of the witnesses.  Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd, 762 F.3d 829, 842 (9th Cir. 2014)

### B.   Analysis

CMI argues that the Court should grant a new trial pursuant to Rule 50 because the evidence was insufficient to support the jury's verdict.  The motion must be denied on this ground for the same reason the Court denied CMI's motion for judgment as a matter of law.

CMI also advances additional arguments in support of its motion for new trial, however, that the Court addresses below.

///

### 1.      Clearly erroneous findings of fact

CMI contends that a new trial on the invalidity of the '764 patent is warranted under Rule 59 because several findings of fact predicate to rejecting CMI's invalidity defenses are clearly erroneous.  ECF No. 269 at 16.  CMI challenges the factual finding that a "sucking channel" in the Koga prior art reference does not meet the "thermal exchange chamber" limitation in the '764 patent.[10]  CMI argues, as it did at trial, that so long as the sucking channel exchanges *some* heat, which Dr. Tilton admits the sucking channel does, it meets the "thermal exchange" limitation.  Id. at 17-18.

The Court, in its Order Entering Judgment in Favor of Asetek, accepted "the jury's implicit and explicit factual findings regarding the scope and content of the prior art, and the differences between the claimed invention and the prior art" because they were supported by substantial evidence.  ECF No. 249 at 18.  With respect to the Koga prior art reference, the Court concluded that CMI had not shown that a person of ordinary skill in the art would understand Koga's sucking channel to constitute a thermal exchange chamber.  Id.  The Court set forth several reasons supported by Dr. Tilton's testimony: the sucking channel's purpose was as a conduit delivering cooling fluid, the heat drawn off in the sucking channel was inconsequential, Koga teaches away from having the sucking channel sit on top of the thermal contact for effective heat transfer and cooling, and Koga did not disclose or suggest that the sucking channel exhibit heat-exchange features.  Id. at 18-19.

While the Koga sucking channel may exchange some heat, CMI has not demonstrated how this meets the "thermal exchange chamber" limitation.  First, both Dr. Tilton and Dr. Carman testified that the primary purpose of the sucking channel was to serve as a conduit in delivering fluid.  See ECF No. 213 (Transcript 12/15/2014) 1417:1-4 (Dr. Tilton testifying, "It's a fluid passage. . . . It only has one purpose, and that's to deliver fluid to the rotational center of the impeller."); ECF No. 215 (Transcript 12/16/2015) 1645:9 (Dr. Carman responding to a jury

---

[10] CMI also argues that the finding that the "water jacket" in the Ryu prior art reference does not meet the "thermal exchange chamber" limitation as similarly flawed.  See ECF No. 269 at 18 n.9.

question: "The primary purpose [of the sucking channel] is to pass fluid to the pump room."). Second, while the fluid may pick up heat, Dr. Tilton also testified that this is an inconsequential amount; and that this would occur anytime the surface was hotter than fluid flowing from that surface. Tr. 1418:5-25.  Third, Dr. Tilton also testified that the Koga sucking channel is not a chamber, but rather, a conduit.  Tr. 1417:5-25.

At bottom, the biggest problem with CMI's argument is that it defies common sense. Under CMI's theory, any kind of liquid container would be a thermal exchange chamber, since – as Asetek expert Dr. Tilton explained – "heat transfer will always happen between any two bodies that are at—at different temperatures." Tr. at 1558:10-11.  To take the colorful example in Asetek's brief, even an insulated beer cooler would qualify as a "thermal exchange chamber" under CMI's construction, because its insulation, being imperfect, will transfer some amount of heat from the outside air to the beer inside the cooler.  The jury was within its rights to reject this theory.

CMI also cites <u>Abbott Labs v. Sandoz, Inc.</u>, 566 F.3d 1282, 1299 (Fed. Cir. 2009) and <u>Embrex Inc. v. Serv. Eng'g Corp.</u>, 216 F.3d 1343, 1352-53 (Fed. Cir. 2000).  <u>Abbott Labs</u> and <u>Embrex</u> do not assist CMI's contention.  Those cases stand for the proposition that *de minimis* infringement is still infringement.  <u>Abbott Labs</u>, 566 F.3d at 1299; <u>Embrex</u>, 216 F.3d at 1352-53. But infringement is not at issue here.  Neither <u>Abbott Labs</u> nor <u>Embrex</u> addresses the question of the extent to which an item of prior art must meet the structural limitations of a claim before that art is relevant to the question of obviousness.  And to the extent CMI is proceeding by way of analogy, the analogy is inapt.

The Court finds that sufficient evidence supports the jury's finding that the sucking channel is not a thermal-exchange chamber.  The Court declines to adopt CMI's argument that the sucking channel meets the "thermal exchange chamber" as a matter of law.

## 2.      Clear weight of trial evidence

CMI next argues that because Koga's sucking channel meets the thermal exchange chamber limitation as a matter of law, a new trial on the invalidity of the '764 patent is warranted

1  under Rule 59.  However, the Court concludes that CMI has not shown that rejection of CMI's

2  invalidity defenses was against the clear weight of the evidence at trial.

3      Next, CMI asserts that the clear weight of trial evidence shows that the asserted claims of

4  the '362 patent and the '764 patent are anticipated or rendered obvious over the prior art presented

5  at trial, but makes no argument in support of this claim.  Instead, CMI merely incorporates by

6  reference 38 pages of its prior briefs.  See ECF No. 269 at 19 (incorporating by reference ECF No.

7  234 at 1-14 and ECF No. 235 at 2-23).  CMI having made no argument, the Court will not address

8  these claims further.  "Issues raised in a brief which are not supported by argument are deemed

9  abandoned."  Kohler v. Inter-Tel Technologies, 244 F.3d 1167, 1182 (9th Cir. 2001); see also

10  Civil L.R. 7-4(a) ("[A] brief or memorandum of points and authorities filed in support, opposition

11  or reply to a motion must contain: . . . [a]rgument by the party, citing pertinent authorities.").

12          **3.      Erroneous and prejudicial jury instructions**

13      "A jury verdict will be set aside, based on erroneous jury instructions, if the party seeking

14  to set aside the verdict can establish that those instructions were legally erroneous, and that the

15  errors had prejudicial effect."  Bettcher Indus., Inc. v. Bunzl USA, Inc., 661 F.3d 629, 641 (Fed.

16  Cir. 2011).

17      CMI argues that a new trial under Rule 59 is warranted because the Court's jury

18  instructions were prejudicial in two respects: the jury instructions did not contain a construction

19  for the "removably attached" limitation, and the instructions on deciding the royalty erroneously

20  created the impression that the Court preferred Dr. Mody's analysis to Mr. Pampinella's analysis.

21  See ECF No. 269 at 19-20.

22      CMI first argues that it was prejudiced with respect to the non-infringement defense on the

23  '362 patent because the jury instructions contained no construction for the "removably attached"

24  limitation and because the Court declined to construe the term.  The parties, however, did not

25  dispute this term during their claim construction hearing, and it was not until CMI's reply brief in

26  support of its motion for summary judgment that it raised the issue.  ECF No. 106 at 14-15.  After

27  oral argument on that motion, the Court determined that the term did not require construction.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1   ECF No. 126 at 14 n.6.  Moreover, CMI never requested a jury instruction on the point.  The

2   parties submitted two sets of proposed jury instructions, but CMI never requested an instruction

3   construing "removably attached" and never mentioned the issue during the hearing on jury

4   instructions.  ECF No. 152 at 25, ECF No. 205 at 4.

5        CMI also argues that a trial is warranted under Rule 59 because jury instruction number

6   24, on the reasonably royalty rate, gave the impression to the jurors that the Court favored Dr.

7   Mody's analysis over Mr. Pampinella's analysis.  See ECF No. 269 at 20.  The paragraph in

8   question read as follows:

> This is just an example of how a reasonable royalty might be
> determined. Whatever methodology is employed to calculate
> damages, the reasonable royalty must reflect business realities to
> ensure that the damages awarded are adequate to compensate the
> patent owner for the infringement. Accordingly, a reasonable royalty
> rate need not be based solely on sales revenue. Instead, depending
> on the circumstances, the parties to the hypothetical negotiation may
> base a reasonable royalty in whole or part on other measures of
> value, including profits or non-monetary benefits. The testimony of
> experts may assist you in determining not only the amount of
> damages that are adequate to compensate for the infringement, but
> also how those damages should be estimated. But it is up to you,
> based on the evidence, to decide the royalty that is appropriate in
> this case.

16  ECF No. 217 at 25-26.  CMI objects that the instruction improperly emphasizes the words

17  "profits" and "non-monetary benefits," thereby favoring Asetek expert Dr. Mody, who presented

18  an effective royalty rate based on lost profits and discussed a non-monetary benefit that justified

19  the rate.  See ECF No. 269 at 20.

20       The instruction was not in error.  It provides only that, *depending on the circumstances*, the

21  royalty rate *may* be based on other measures of value.  The Court did not instruct the jury

22  specifically to consider profits or non-monetary benefits or to give Dr. Mody's analysis more

23  weight than Mr. Pampinella's.  The Court simply listed many of the factors, taken from the case

24  law, which the jury could consider in evaluating the reasonable royalty evidence.  The jury

25  instruction did not dissuade or preclude the jury from fairly considering CMI's evidence.

26       The Court concludes that CMI is not entitled to a new trial.

27  ///

28

United States District Court
Northern District of California

## IV.   ASETEK'S MOTION FOR ENTRY OF A PERMANENT INJUNCTION

Asetek filed a motion for entry of a permanent injunction on June 29, 2015.  ECF No. 266.
Asetek asks the Court to prohibit CMI, and others acting in concert with CMI, such as Cooler
Master Co., Ltd. of Taiwan ("Cooler Master"), from continuing to infringe the '362 and the '764
patents.

### A.   Legal standard

A patentee may seek entry of a permanent injunction after a finding of infringement.  See
35 U.S.C. § 283 ("[A court] may grant injunctions in accordance with the principles of equity to
prevent the violation of any right secured by patent, on such terms as the court deems
reasonable.").  However, there is no presumption in favor of an injunction in patent infringement
cases.  See eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 392-93 (2006).  The patentee bears
the burden of showing that four traditional equitable factors support entry of a permanent
injunction: (1) that the patentee has suffered irreparable harm; (2) that "remedies available at law
are inadequate to compensate for that injury"; (3) that "considering the balance of hardships
between the plaintiff and defendant, a remedy in equity is warranted"; and (4) that "the public
interest would not be 'disserved' by a permanent injunction."  i4i Ltd. P'ship v. Microsoft Corp.,
598 F.3d 831, 861 (Fed. Cir. 2010) (citing eBay, 547 U.S. at 391).

### B.   Analysis

Asetek asks the Court to enter a permanent injunction to prohibit CMI's infringing sales of
Cooler Master products.  ECF No. 266.  It argues that, along with establishing the equitable
factors that support entry of a permanent injunction, a permanent injunction is warranted because
Asetek has invested substantial resources to developing the market for liquid-cooling devices,
refuses to grant licenses to competitors, and CMI continues to infringe despite an adverse jury
verdict.  ECF No. 266.

#### 1.   The equitable factors

##### a.   Irreparable harm

To demonstrate irreparable harm in a patent infringement suit, a patentee must establish:

21

1    "1) that absent an injunction, it will suffer irreparable harm, and 2) that a sufficiently strong causal

2    nexus relates the alleged harm to the alleged infringement."  Apple Inc. v. Samsung Electronics

3    Co., 695 F.3d 1370, 1374 (Fed. Cir. 2012) ("Apple II").  Asetek argues that irreparable harm is

4    shown by the following: Asetek and CMI are direct competitors; CMI's continuing infringement

5    interferes with Asetek's right to exclusively practice its inventions; CMI's infringement harms

6    Asetek's reputation; and permitting CMI to continue will encourage other infringers to enter the

7    market.  Asetek also argues that there is a sufficient causal nexus between the Asetek-patented

8    features of CMI's products and sales of those products.

9                             **(1)**        **Causal nexus**

10    Because the harm to be avoided is the sale of infringing products, a patentee must show

11    that consumers purchase those products for their patented features.  The patent owner is not

12    "necessarily required to show that a patented feature is the sole reason" for consumers' purchases,

13    but rather must "show that the infringing feature drives consumer demand for the accused

14    product."  Apple Inc. v. Samsung Electronics Co., 735 F.3d 1352, 1364 (Fed. Cir. 2013) ("Apple

15    III") (citations omitted).  "[T]he relevant inquiry focuses on the objective reasons as to why the

16    patentee lost sales," Apple, Inc. v. Samsung Electronics Co., 678 F.3d 1314, 1328 (Fed. Cir. 2012)

17    ("Apple I"), and "should focus on the importance of the claimed invention in the context of the

18    accused product, and not just the importance, in general, of features of the same type as the

19    claimed invention."  Apple III, 735 F.3d at 1364.

20    Here, there was ample evidence that the patented features of the cooling devices at issue

21    drove demand for those products, and CMI does not contest that the requisite nexus is present.

22                             **(2)**        **Direct competition**

23    "Direct competition in the same market is certainly one factor suggesting strongly the

24    potential for irreparable harm without enforcement of the right to exclude."  Presideo

25    Components, Inc. v. Am. Technical Ceramics Corp., 702 F.3d 1351, 1363 (Fed. Cir. 2012)

26    (citations omitted).  Facts "relating to the nature of the competition between the parties" are

27

28

United States District Court
Northern District of California

therefore "undoubtedly are relevant to the irreparable harm" inquiry.  Robert Bosch LLC v. Pylon

Mfg. Corp., 659 F.3d 1142, 1150 (Fed. Cir. 2011).

Here, the Court easily concludes that the parties are direct competitors.  For one thing,

Asetek and CMI have already stipulated that CMI competes with Asetek and Corsair in the liquid-

cooling market.  See ECF No. 198 (Transcript 12/08/2014) 561:16-17.  The parties have also

stipulated that CMI competes with Asetek for sales and that CMI priced its products with intent to

capture market share from Asetek.[11]  See Tr. at 561:16-562:5.  Indeed, as to some CMI products,

the *only* competitive products are ones manufactured by Asetek.  ECF No. 130 at 4.

Notwithstanding this stipulation, CMI now argues that Asetek and CMI are not direct

competitors because they distribute into different markets.  ECF No. 287 at 3.  CMI characterizes

Asetek as a manufacturer and supplier of liquid cooling systems that sells to resellers and

characterizes CMI as a reseller that sells computer peripherals to consumer channels.  Id.  CMI

points out that, unlike Asetek, it does not participate at all in the original equipment manufacturer

market.  Id. at 3-4.  And within the consumer market, CMI argues that the competition "is at best

indirect," because Asetek sells to other resellers and CMI is a reseller that sells to consumer

channels.  Id. at 4.

CMI's arguments are misplaced.  CMI and Asetek have already stipulated to material facts

regarding the competitive relationship between the parties, and the jury was instructed to treat

those facts as having been proved.  See ECF No. 217 at 14; see also United States v.

Mikaelian,168 F.3d 380, 389 (9th Cir.1999) ("When parties enter into stipulations as to material

facts, those facts will be deemed to have been conclusively proved, and the jury may be so

instructed.").  Additionally, while CMI operates as a reseller of Cooler Master products, CMI also

collaborates with Cooler Master in designing, selling, and setting prices for the liquid-cooling

products.  See ECF No. 198 (Transcript 12/08/2014) 560:14-561:2.

The Court concludes that Asetek and CMI are direct competitors.

---

[11] Asetek, however, has not provided sufficient evidence that it actually lost market share as a result of CMI's infringement.

### (3)    Core business and exclusivity

That a patented product is at the "core" of a business is another salient, though not dispositive, factor courts consider when granting an injunction.  See Robert Bosch, 659 F.3d at 1152.

Asetek's CEO, André Eriksen, testified at trial that Asetek's sole business centers around developing and selling liquid-cooling products and that the patents-in-suit are the foundation of all of Asetek's products.  See ECF No. 192 (Transcript 12/03/2014) 318:23-319:3.  Further, Asetek has invested over $75 million dollars and countless hours developing and selling these products and attests that it is seen as an innovator of these products.  See Tr. 297:21-298:4.  Finally, Asetek has received numerous requests to license its technology but has consistently refused.  Tr. 432:22-434:14, 435:22-437:17.  Asetek has engaged in multiple lawsuits to enforce its patent rights.  See, e.g., Asetek Holdings, Inc. et al v. CoolIT Systems, Inc., Case No. 3:12-cv-04498-EMC.  These factors all weigh in favor of finding that Asetek would be irreparably harmed if the Court did not issue a permanent injunction.  See, e.g., Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc., No. CV 08-309-LPS, 2014 WL 2960035, at *1 (D. Del. June 30, 2014) (finding irreparable harm where the patentee had practiced the patents-in-suit, sales of the embodiments constituted the core of the business, and had never licensed the patents-in-suit to any of its competitors).

### (4)    Harm to reputation

The possibility that the patentee will suffer "erosion in reputation and brand distinction" is relevant to a showing of irreparable harm.  Douglas Dynamics, LLC v. Buyers Products Co., 717 F.3d 1336, 1344 (Fed. Cir. 2013); see also Celsis In Vitro, Inc. v. CellzDirect, Inc., 664 F.3d 922, 930–31 (Fed. Cir. 2012) ("Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm.").  That is because when infringing products are on the market, a patentee's products "lose some of [their] distinctiveness and market lure" because competitors can contend that they have similar features without acknowledging that those features infringe on the patentee's intellectual property.  Douglas Dynamics, 717 F.3d at 1344.

Asetek contends that "CMI's infringement irreparably harms Asetek's reputation as an innovator by allowing CMI to misrepresent Asetek's inventions as its own."  ECF No. 264-3 at 17.  CMI responds that Asetek has allowed infringing products to remain in the market by granting a license to Corsair, a reseller, who sold infringing products made by a company other than Asetek.  ECF No. 287 at 5.  The license was coupled with a covenant not to sue.  Id. at 4-5.  CMI argues that Asetek's reputation could not truly be harmed by the sales of infringing products if it was willing to allow Corsair to purchase such products from others and resell them.  Id. at 5.  CMI also points out that it could have been a reseller of Asetek products but for a disagreement about the appropriate royalty rate.  Id.

"While the fact that a patentee has previously chosen to license the patent may indicate that a reasonable royalty does compensate for an infringement, that is but one factor for the district court to consider.  The fact of the grant of previous licenses, the identity of the past licensees, the experience in the market since the licenses were granted, and the identity of the new infringer all may affect the district court's discretionary decision concerning whether a reasonable royalty from an infringer constitutes damages adequate to compensate for the infringement."  Acumed LLC v. Stryker Corp., 551 F.3d 1323, 1328 (Fed. Cir. 2008).  A patentee's past willingness to license its patent is not sufficient per se to establish a lack of irreparable harm if a new infringer were not enjoined.  Id. at 1328.  Here, the evidence showed that Asetek gave a license to Corsair in part because Corsair was Asetek's customer, not its competitor, and a license would encourage additional purchases of Asetek's products.  Also, Asetek agreed to the license during a difficult financial period.  Finally, the license, which has since expired, was "short-lived."  ECF No. 295 at 4.  On these facts, the Court finds that the Corsair license was not representative of Asetek's position in the market, and that Asetek would suffer reputational harm in the market without the issuance of an injunction.

In sum, the Court concludes that Asetek has shown that it would suffer irreparable harm in the absence of an injunction.

///

1

### b.     Inadequate remedies at law

2     The second factor in the Court's analysis requires the patentee to demonstrate that

3    "remedies available at law, such as monetary damages, are inadequate to compensate" the patentee

4    for the irreparable harm it has suffered.  eBay, 547 U.S. at 391.  The analysis for this factor

5    overlaps with that for the first factor.  MercExchange, L.L.C. v. eBay, Inc., 500 F. Supp. 2d 556,

6    582 (E.D. Va. 2007).  Where there "is no reason to believe" that infringement or the irreparable

7    harm resulting from infringement will otherwise cease absent an injunction, money damages are

8    inadequate.  Robert Bosch, 659 F.3d at 1155.

9     Money damages are inadequate to remedy the harm to Asetek from CMI's continuing

10   infringement.  Even after the jury's verdict, CMI continued to sell the infringing products in the

11   United States through May 2015.  ECF No. 266 at 7; ECF No. 266-2, Decl. of Jeffrey Smyth, Ex.

12   24.

13    Money damages would also be inadequate to compensate Asetek for difficult-to-calculate

14   injuries such as harm to its reputation and inability to exclude others from practicing its patents.

15   See Douglas Dynamics, 717 F.3d at 1345 (discussing how remedies at law are inadequate for

16   reputational loss).  Injunctive relief is the traditional remedy for loss of exclusivity, because the

17   payment of money does not repair that injury.  Brocade Commc'ns Sys., Inc. v. A10 Networks,

18   Inc., No. C 10-3428 PSG, 2013 WL 140039, at *4 (N.D. Cal. Jan. 10, 2013).  "As the Federal

19   Circuit instructs, 'the axiomatic remedy for trespass on property rights is removal of the

20   trespasser.'"  Id.  (quoting Presidio Components, Inc. v. Am. Technical Ceramics Corp., 702 F.3d

21   1351, 1362 (Fed. Cir. 2012)).

22    The Court finds that Asetek has shown that remedies at law are inadequate.

23   ### c.     Balance of the hardships

24    The balance of hardships factor "assesses the relative effect of granting or denying an

25   injunction on the parties."  i4i Ltd. P'ship, 598 F.3d at 862.

26    The balance of hardships weighs in Asetek's favor.  Denying an injunction would force

27   Asetek to compete against its own patented technology.  See Robert Bosch, 659 F.3d at 1156

28

United States District Court
Northern District of California

1   (finding that the balance of hardships favored the patentee because requiring the patentee to

2   compete against its own patented technology, along with the irreparable harms, places a

3   substantial hardship on the patentee).  As previously discussed, Asetek's sole business is

4   developing and selling liquid-cooling products.  By comparison, CMI sells other products, with

5   less than 10% of its revenue coming from liquid-cooling products.  ECF No. 266 at 18; ECF No.

6   203 (Transcript 12/11/2014) 1068:6-7.

7        CMI argues that "[t]he issuance of an injunction against CMI might erode consumer

8   confidence in CMI in light of the negative public connotations often associated with an

9   injunction."  ECF No. 287 at 13.  This argument adds very little to CMI's side of the ledger.  The

10  public will already know that a jury found that CMI infringes Asetek's patents.  It is difficult to

11  see what additional harm CMI would suffer in consumers' eyes from the issuance of an injunction.

12       Asetek has shown that it will suffer greater harm from the absence of an injunction than

13  CMI would suffer from the issuance of one.

### d.      Public interest

15       The final factor of the injunction test asks whether a permanent injunction would disserve

16  the public interest.  The public interest generally favors protecting the rights of patentees and

17  enforcing the patent system.  See ActiveVideo Networks, Inc. v. Verizon Commc'ns, 694 F.3d

18  1312, 1341 (Fed. Cir. 2012).

19       Asetek argues that the public interest would be served with a permanent injunction because

20  the public has an interest in the protection of property rights.  ECF No. 269 at 19.  CMI counters

21  that the public interest would not be served because it would have unintended anti-competitive

22  effects.  ECF No. 287 at 10.

23       The Court concludes that Asetek has shown that the public interest favors entry of a

24  permanent injunction.  The Court "agrees with the general premise that competition serves the

25  public interest" because it advances innovation and enables competitive pricing.  Douglas

26  Dynamics, 717 F.3d at 1346.  In the present case, however, permitting CMI to compete in the

27  marketplace using Asetek's patented technology would "have the effect of inhibiting innovation

28

United States District Court
Northern District of California

and incentive." Id.  Accordingly, the Court concludes that the public has a greater interest in "the judicial protection of property rights in inventive technology" outweighs the interest in any of the alleged anti-competitive effects the injunction may have on CMI.  Id.

The Court concludes that Asetek has satisfied all four factors in the injunction analysis.

### 2.       Entry of an injunction would not be premature

CMI argues that entry of a permanent injunction would be premature because all of the asserted claims under the '764 patent were rejected at the U.S. Patent and Trademark Office ("PTO") in a post-issuance proceeding, and there is a good chance that some parts of this Court's judgment will be overturned.  ECF No. 287 at 11.

This is not a persuasive reason to delay issuing an injunction.  The '362 patent is currently not subject to reexamination, and the jury found that all of CMI's accused products infringe the '362 patent.  See ECF No. 219.  Because CMI's products infringe Asetek's valid patent rights regardless of the outcome of the '764 reexamination proceeding, entry of an injunction is appropriate.  Should patent '764 be finally adjudged invalid in another proceeding, CMI can petition the Court to modify the injunction.

### 3.       Application of the injunction to Cooler Master

Asetek asks that the injunction apply not only to CMI, but also to Cooler Master Co., Ltd. of Taiwan.  It argues that Cooler Master "continues to play an active role in CMI's infringement." ECF No. 264-3 at 12.[12]

An injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure binds not only the parties, but also "the parties' officers, agents, servants, employees, and attorneys" and "other persons who are in active concert or participation with" them.  Fed. R. Civ. P. 65(d)(2)(A)-(C). The phrase "active concert or participation" includes both aiders and abettors of, and privies of, an enjoined party. See Golden State Bottling Co., v. NLRB, 414 U.S. 168, 179-80 (1973) (citing

---

[12] Cooler Master was originally named as a defendant, but the parties filed a stipulation of dismissal as to all claims between Asetek and Cooler Master.  ECF No. 85.  CMI and Asetek stipulated that CMI is authorized by Cooler Master to sell Cooler Master-branded liquid-cooling devices in the United States.  CMI also collaborates with Cooler Master, in designing and selling Cooler Master-branded liquid-cooling products.  ECF No. 198 (Transcript 12/08/2014) 560:9-16.

United States District Court
Northern District of California

1   Regal Knitwear Co. v. N.L.R.B., 324 U.S. 9, 14 (1930)).

2       Although Cooler Master is not a party in this action, Asetek argues that Cooler Master is

3   subject to an injunction because it acts in concert with CMI.  ECF No. 266 at 22.  CMI does not

4   seriously dispute this, but argues that an injunction against non-party Cooler Master would be

5   inappropriate since Asetek previously voluntarily dismissed Cooler Master with prejudice from

6   the litigation.  See ECF Nos. 85; 287 at 11-12.

7       The Court finds that Cooler Master is appropriately subject to an injunction.  The parties

8   agree that CMI is authorized by third party Cooler Master to sell Cooler Master-branded liquid-

9   cooling devices in the United States.  ECF No. 198 (Transcript 12/08/2014) 560:14-561:2.  CMI

10  and Cooler Master have an exclusivity agreement where CMI is Cooler Master's exclusive U.S.

11  distributor.  See ECF No. 203 (Transcript 12/11/2014) 1106:25-1107:3.  At least as importantly,

12  the parties have stipulated that CMI and Cooler Master jointly developed the infringing products

13  at issue.  ECF No. 198 (Transcript 12/08/2014) 561:23-562:9.

14      These facts are sufficient to show that there is a "significant history and contractual

15  relationship" between CMI and Cooler Master "bearing directly on the conduct to be enjoined"

16  See Netlist Inc. v. Diablo Techs, Inc., No. 13-CV-05962-YGR, 2015 WL 163434, at *2 (N.D. Cal.

17  Jan. 12, 2015).  For example, in Netlist, the court found that it was appropriate to name third

18  parties in a preliminary injunction order as entities who acted in concert with the alleged infringer.

19  Id.  The third parties had worked with the defendant to develop an infringing product.  Id.  The

20  defendant also announced that it had entered into an exclusive relationship with one of the third

21  parties to design and manufacture the product.  Id.  At the time of the court's decision, the third

22  parties also had multiple fulfilled and unfulfilled purchase orders.  Id.  In sum, the court found that

23  "the particular nature of the relationship here establishes an identity of interests, and lack of

24  independence" between the defendant and the third parties to consider them in privity for the

25  preliminary injunction.  Id.

26      Similarly, in Aevoe Corp v. AE Tech. Co., 727 F.3d 1375, 1384 (Fed. Cir. 2013), the

27  Federal Circuit affirmed the enforcement of an injunction against a reseller of products because it

28

United States District Court
Northern District of California

29

United States District Court
Northern District of California

1  was acting in concert with the accused patent infringer defendant.  Id.  The contractual relationship

2  between the defendant and the reseller made the reseller a privy of the defendant, and therefore

3  bound by the terms of the injunction.  Id.  Although the district court later amended the injunction

4  to name the reseller, the order only confirmed that contracting partners of the defendant could not

5  sell the infringing products.  Id.

6      Because of Cooler Master's past history in developing the infringing products and its

7  contractual relationship with CMI, the Court finds that Cooler Master is an appropriate subject of

8  the injunction under Rule 65(d)(2).

9          **4.      Scope of the injunction**

10     Under Federal Rule of Civil Procedure 65, "every order granting an injunction and every

11  restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall

12  describe in reasonable detail, and not by reference to the complaint or other document, the act or

13  acts sought to be restrained."  FED. R. CIV. P. 65(d).  An injunction "cannot impose unnecessary

14  restraints on lawful activity."  Riles v. Shell Exploration & Prod. Co., 298 F.3d 1302, 1311 (Fed.

15  Cir. 2002); see also Johns Hopkins Univ. v. CellPro, Inc., 152 F.3d 1342, 1365 (Fed. Cir. 1998)

16  ("judicial restraint of lawful non-infringing activities must be avoided.").

17     Asetek is entitled to an injunction directed toward Defendants' activities which cause

18  domestic infringement as well as the activities of those persons or companies acting in concert

19  with CMI.  The Court will issue an injunction that enjoins CMI, as well as Cooler Master, from

20  making, using, offering for sale or selling in the United States, or importing into the United States

21  any of the accused products as well as from otherwise infringing or inducing others to infringe the

22  claims of the one or more of United States Patents Nos. 8,240,362 and 8,245,764.

23     Asetek requests that the injunction take the following form:

24          (1) As used herein, "Infringing Products" shall mean the following
           Cooler Master products: Seidon 120M, Seidon 120XL, Seidon
25          240M, Seidon 120V, Seidon 120V Plus, Nepton 140XL, [Nepton
           280L], Glacer 240L, and products not more than colorably different
26          from them.

27          (2) CMI USA, Inc. and its subsidiaries and affiliated companies
           (collectively defined as "CMI"), as well as CMI's successors,
28

30

assigns, officers, directors, agents, servants, employees, representatives and attorneys, and those persons in active concert or participation with them who receive notice of the order are hereby immediately and permanently restrained and enjoined, pursuant to 35 U.S.C. § 283 and Fed. R. Civ. P. 65(d), from making, using, offering for sale or selling in the United States, or importing into the United States, or causing to be made, used, offered for sale, or sold in the United States, or imported into the United States, the Infringing Products.

(3) Cooler Master Co., Ltd. and its subsidiaries and affiliated companies (collectively defined as "Cooler Master"), as well as Cooler Master's successors, assigns, officers, directors, agents, servants, employees, representatives and attorneys, and those persons in active concert or participation with them who receive notice of the order are hereby immediately and permanently restrained and enjoined, pursuant to 35 U.S.C. § 283 and Fed. R. Civ. P. 65(d), from making, using, offering for sale or selling in the United States, or importing into the United States, or causing to be made, used, offered for sale, or sold in the United States, or imported into the United States, the Infringing Products.

(4) CMI and Cooler Master shall provide written notice of this judgment and order, and the injunction ordered herein, to: their officers, directors, agents, servants, representatives, attorneys, employees, subsidiaries and affiliates, and those persons in active concert or participation with them, including any and all manufacturers, distributors, retailers, and service providers who have been involved in the making, using, selling, offering for sale or importing of any Infringing Products; and to all other persons or entities involved in any way with the making, using, selling, offering for sale or importing of any Infringing Products. CMI and Cooler Master shall take whatever means are necessary or appropriate to ensure that this order is properly complied with.

(5) CMI and Cooler Master shall include a copy of this Order and the written notice in paragraph (7) below along with every bill of sale for the Infringing Products and in the boxes in which the Infringing Products are shipped or sold, regardless of where they are sold, indicating that they infringe the patents-in-suit, are subject to an injunction in the United States, and thus cannot be sold, offered for sale, imported, or used in the United States.

(6) CMI and Cooler Master shall also require any manufacturer of the Infringing Products to include a copy of this Order and the written notice in paragraph (7) below along with every bill of sale for the Infringing Products and in the boxes in which the Infringing Products are shipped or sold, regardless of where they are sold, indicating that they infringe the patents-in-suit, are subject to an injunction in the United States, and thus cannot be sold, offered for sale, imported, or used in the United States.

(7) The written notice to be provided along with every bill of sale and in the boxes in which the Infringing Products are shipped or sold shall state:

United States District Court
Northern District of California

**This product is affected by a Permanent Injunction entered by the United States District Court for the Northern District of California in Civil Action No. 3:13-CV-00457-JST (copy enclosed). This product or its use infringes U.S. Patent Nos. 8,240,362 and 8,245,764, which are assigned to Asetek Danmark A/S. Accordingly, certain acts associated with this product are prohibited.**

**<u>This product may not be sold, offered for sale, or used in the United States. Nor can this product be imported into the United States.</u>**

CMI makes several objections to Asetek's proposed language. First, CMI argues that the Seidon 120V Plus should not be identified as an infringing product, because the jury did not specifically find that the Seidon 120V Plus infringed. ECF No. 313 at 2. The parties stipulated, however, that the Seidon 120V Plus has the same pump head design as the Seidon 120V, which does infringe. <u>See</u> ECF No. 130 at 4; ECF No. 198 (Transcript 12/08/2014) 562:10-11. Because the Seidon 120V Plus is not colorably different from the Seidon 120V, the Court finds that it should be included in the injunction.

CMI also contends that Paragraph (4) of Asetek's form of injunction "is overreaching and is abusive, and seeks to impose a[n unfair] competitive disadvantage on CMI." The Court finds that the language in Asetek's proposed form of injunction is appropriate in light of the evidence at trial.

CMI argues that it cannot "require" its manufacturers to include a copy of the injunction with the bill of sale for, or in the boxes of, the infringing products, as Asetek's form of order requires. ECF No. 313 at 3. Asetek responds that the notice requirement and language of paragraphs (5)-(7) are based on the injunction in <u>SynQor, Inc. v. Asrtesyn Techs., Inc.</u>, No. 2:07-CV-497-TJW-CE, 2011 WL 238645 (E.D. Tex. Jan. 24, 2011), <u>aff'd</u> 709 F.3d 1365 (Fed. Cir. 2013). The district court in <u>SynQor</u>, however, expressly grounded its language on the jury's finding of induced infringement. <u>Id.</u> at *7 ("Given the jury's finding of induced infringement . . ."). Asetek did not pursue an induced infringement theory at trial. The Court will not order CMI and Cooler Master to notify its manufacturers of its infringement or require the

order of infringement to be included in all future sales to its manufacturers.

For the foregoing reasons, the Court orders that the injunction take the following form:

(1) As used herein, "Infringing Products" shall mean the following Cooler Master products: Seidon 120M, Seidon 120XL, Seidon 240M, Seidon 120V, Seidon 120V Plus, Nepton 140XL, Nepton 280L, Glacer 240L, and products not more than colorably different from them.

(2) CMI USA, Inc. and its subsidiaries and affiliated companies (collectively defined as "CMI"), as well as CMI's successors, assigns, officers, directors, agents, servants, employees, representatives and attorneys, and those persons in active concert or participation with them who receive notice of the order are hereby immediately and permanently restrained and enjoined, pursuant to 35 U.S.C. § 283 and Fed. R. Civ. P. 65(d), from making, using, offering for sale or selling in the United States, or importing into the United States, or causing to be made, used, offered for sale, or sold in the United States, or imported into the United States, the Infringing Products.

(3) Cooler Master Co., Ltd. and its subsidiaries and affiliated companies (collectively defined as "Cooler Master"), as well as Cooler Master's successors, assigns, officers, directors, agents, servants, employees, representatives and attorneys, and those persons in active concert or participation with them who receive notice of the order are hereby immediately and permanently restrained and enjoined, pursuant to 35 U.S.C. § 283 and Fed. R. Civ. P. 65(d), from making, using, offering for sale or selling in the United States, or importing into the United States, or causing to be made, used, offered for sale, or sold in the United States, or imported into the United States, the Infringing Products.

(4) Within 14 days of issuance of this order, CMI and Cooler Master shall provide written notice of this judgment and order, and the injunction ordered herein, to: their officers, directors, agents, servants, representatives, attorneys, employees, subsidiaries and affiliates, and those persons in active concert or participation with them. CMI and Cooler Master shall take whatever means are necessary or appropriate to ensure that this order is properly complied with.

(5) CMI and Cooler Master shall include a copy of this Order and the written notice in paragraph (6) below along with every bill of sale for the Infringing Products and in the boxes in which the Infringing Products are shipped or sold, regardless of where they are sold, indicating that they infringe the patents-in-suit, are subject to an injunction in the United States, and thus cannot be sold, offered for sale, imported, or used in the United States.

(6) The written notice to be provided along with every bill of sale and in the boxes in which the Infringing Products are shipped to or sold in the United States shall state:

**This product is affected by a Permanent Injunction entered by the United States District Court for the Northern District of California in Civil Action No. 3:13-CV-00457-JST (copy enclosed). This product or its use infringes U.S. Patent Nos. 8,240,362 and 8,245,764, which are assigned to Asetek Danmark A/S. Accordingly, certain acts associated with this product are prohibited.**

**This product may not be sold, offered for sale, or used in the United States. Nor can this product be imported into the United States.**

(7) This injunction order shall remain in effect until both of U.S. Patent Nos. 8,240,362 and 8,245,764 have expired. Should either patent be finally adjudged invalid in another proceeding, either party may petition the Court to request a modification of the injunction.

## V.    ASETEK'S MOTION TO ALTER JUDGMENT

The jury's award of $404,941 was based on a reasonably royalty rate of 14.5% for infringing sales from November 28, 2012 through September 30, 2014.  See ECF No. 219 at 5.  In Asetek's motion to alter judgment, Asetek requests that the Court amend the judgment to award Asetek supplemental damages, enhanced damages, and pre-and post-judgment interest.  See ECF No. 267.  Asetek also requests that the Court order an accounting and order CMI to produce updated sales and revenue information through the date of the injunction, so that the judgment may be amended to account for CMI's infringing sales through the injunction.  See id.

### A.    Legal standard

Section 284 of the Patent Act provides: "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."  35 U.S.C. § 284.

### B.    Analysis

#### 1.    Supplemental damages

Patentees are entitled to supplemental damage awards for infringing sales that a jury does not consider and precedes entry of a permanent injunction.  See Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197, 1212-13 (Fed. Cir. 2010).  The amount of supplemental damages is within

the sound discretion of the court.  Amado v. Microsoft Corp., 517 F.3d 1353, 1362 n. 2 (Fed. Cir. 2008).

In the present case, the jury's damages award was limited to CMI's infringing sales through September 30, 2014, although the verdict was entered on December 17, 2014.  Asetek requests the Court award supplemental damages by applying the jury's 14.5% reasonable royalty rate to the infringing sales made during this time period.  The Court concludes that Asetek is entitled to supplemental damages to cover this period of infringing activity at the jury's 14.5% rate.

### 2.    Accounting

Asetek requests that the Court order an accounting and order CMI to produce updated sales and revenue information through the date of the injunction, so that the judgment may be amended to account for CMI's infringing sales through the injunction.  Courts may also grant motions for further accounting to consider certain periods of infringing activity.  See, e.g., Metso Minerals, Inc. v. Powerscreen Int'l Distribution Ltd., 833 F. Supp. 2d 333, 347 (E.D.N.Y. 2011); Mikohn Gaming Corp. v. Acres Gaming, Inc., No. CV-S-97-1383-EJW, 2011 WL 34778689, at *22 (D. Nev. Aug. 2, 2001).  Asetek does not contest this request.  Accordingly, as set forth below, the Court will order one if necessary after the parties have met and conferred.

### 3.    Enhanced damages

Asetek requests that the Court award enhanced damages for sales occurring after the jury's verdict.  See ECF No. 267 at 5.  Under section 284, the court may enhance damages awards up to three times the amount found or assessed.  35 U.S.C. § 284.  An award of enhanced damages for infringement, as well as the extent of the enhancement, is committed to the discretion of the trial court.  Read Corp. v. Portec, Inc., 970 F.2d 816, 826 (Fed. Cir. 1992), abrogated on other grounds by Markman v. Westview Instruments, Inc., 52 F.3d 967, 975 (Fed Cir. 1995).

Before a court enhances damages, the court must find willfulness.  Spectralytics, Inc. v. Cordis Corp., 649 F.3d 1336, 1349 (Fed. Cir. 2011).  However, even a finding of willfulness "does not mandate that damages be enhanced."  Read Corp., 970 F.2d at 826.  "The paramount

determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances." Id.[13]

CMI first objects that Asetek stipulated before trial that it would not assert willful infringement, see ECF No. 130 at 6, and cannot now seek to avoid its stipulation to make a distinction between pre- and post-verdict sales.  CMI further argues that its actions were not willful.  See ECF No. 288 at 8.  Finally, CMI contends that this was a "close" case.  Id. at 15.

This Court was previously called upon to enforce another of the parties' stipulations when it sustained Asetek's objection to CMI raising the topic of the '764 patent reexamination during trial.  See ECF No. 130 at 6; ECF No. 213 (Transcript 12/15/2014) 1480:7-1481:17.  The Court decided that permitting CMI to impeach Asetek's expert with evidence of the reexamination proceedings would be "violative of the parties' stipulation" which is entitled to be "enforced by its terms."  Tr. 1480:7-1481:17.

The circumstances here are different.  Asetek did not violate the parties' stipulation.  It did not assert willful infringement during trial.  ECF No. 130 at 6.  Asetek prevailed at the trial, however, and the jury found that CMI was infringing Asetek's patents.  Following that verdict, CMI continued to sell its infringing products into the market.  As the court noted in SynQor, there is no reason why a patentee's decision not to argue "*pre-verdict* willful infringement at trial should preclude the district court from finding willful infringement for *post-verdict* sales."  709 F.3d at 1385 (emphasis in original).

Turning to the merits, the Court finds that CMI's conduct in selling infringing products after an adverse jury verdict constituted willful infringement.  Although CMI's sales of infringing

---

[13] Courts may properly consider the following factors in determining whether to award enhanced damages and in what amount:  (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the defendant's size and financial condition; (5) the closeness of the case; (6) the duration of defendant's misconduct; (7) remedial action by the defendant, if any; (8) the defendant's motivation for harm; and (9) whether the defendant attempted to conceal its misconduct.  Read Corp., 970 F.2d at 827-28.  The parties do not discuss most of these factors, and so neither does the Court.

United States District Court
Northern District of California

products began to drop in April 2014 and ceased in June 2014, sales actually *increased* in the three months following the jury's verdict.  See ECF No. 267-6, Mody Decl. Ex. B.  CMI asserts that it has phased out these products but does not explain why sales increased in the months following entry of the jury's verdict.  See ECF No. 287 at 9.

CMI insists that it acted in good faith because it holds a good faith belief that its products do not infringe and cites to the reexamination of the '764 patent and appeal at the PTO.  Id. at 3-4.  CMI states that it has an objectionably reasonable belief that the '764 patent is invalid in light of the reexamination.  Id. at 8.  CMI cannot use this as a basis to disregard the jury's findings of infringement of the '362 patent.

Finally, the Court rejects the contention that this was a close case.  CMI's products were direct copies of Asetek's products.  Although CMI contests the continuing validity of the '764 patent, it conceded that it infringed that patent.  ECF No. 130 at 6.  CMI and Cooler Master had Asetek Generation III products in their possession when they collaborated to design the infringing Seidon products, ECF No. 198 (Transcript 12/08/2014) 562:6-9, and they copied Asetek's Generation III pump for the infringing Seidon 120M/120XU240M products, as the jury and the Court so found.  ECF No. 249 at 11 ("Cooler Master Co., Ltd./CMI USA and Zalman copied Asetek's Generation III and Generation IV commercial products, respectively."); ECF No. 219 at 4 (finding copying of the claimed invention by others).

On these facts, the Court concludes that an enhancement for post-verdict damages is warranted.  See SynQor, 709 F.3d at 1385 (upholding the district court's enhancement by a factor of 1.75 where the district court found the infringer's conduct egregious in continuing and increase in sales in face of an infringement verdict).  Asetek requests that the Court double the jury's reasonable royalty rate because of CMI's willful infringement and "deliberate copying and litigation behavior."  See ECF No. 268 at 5 (citing Stryker Corp. v. Davol Inc., 234 F.3d 1252, 1259-60 (Fed. Cir. 2000)).

The Court will enhance damages for post-verdict sales by 1.75, as the SynQor court did, for an effective royalty rate of 25.375%.  This amount reflects the degree of CMI's willfulness, as

United States District Court
Northern District of California

United States District Court
Northern District of California

described above, but does not unduly penalize CMI or generate a windfall for Asetek. CMI's profit margins are comparable to this royalty rate. See ECF No. 267-4 (Mody Decl.) at 4. This enhanced royalty rate will apply from the date of the verdict until the date the permanent injunction goes into effect and the infringement ceases. TransPerfect Global, Inc. v. MotionPoint Corp., No. C 10-2590 CW, 2014 WL 6068384, at *5 (N.D. Cal. Nov. 13, 2014).

### 4. Prejudgment interest

A prevailing patentee is also entitled to prejudgment interest, absent extraordinary circumstances. See 35 U.S.C. § 284; Gen. Motors Corp. v. Devex Corp., 461 U.S. 648, 657 (1983) ("We hold only that prejudgment interest should be awarded under § 284 absent some justification for withholding such an award."). Such interest is ordinarily awarded "from the date of the infringement to the date of judgment." Junker v. HDC Corp., Case No. 3:07-cv-05094, 2008 WL 3385819, at *6 (N.D. Cal. July 28, 2008) (citing Informatica Corp. v. Bus. Objects Data Integration, Inc., 489 F.Supp.2d 1075, 1087 (N.D. Cal. 2007). The purpose of awarding prejudgment interest is to fully compensate the patent holder for the infringement. Gen. Motors, 461 U.S. at 653. The court is afforded wide latitude in the selection of interest rates in order to ensure this purpose is met. Uniroyal, Inc. v. RudkinWiley Corp., 939 F.2d 1540, 1545 (Fed. Cir. 1991) (citations omitted); see also Junker, 2008 WL 3385819, at *6 (stating that the court may use the prime rate, the prime rate plus a percentage, the U.S. Treasury rate, state statutory rate, corporate bond rate, or any other rate the court deems appropriate). The court may also assess compound interest to fully compensate the patentee. Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc., No. C 03-1431 SBA, 2008 WL 928535, at *2 (N.D. Cal. Apr. 4, 2008).

Asetek requests that the court award prejudgment interest at the prime rate of 3.25%, compounded monthly. ECF No. 269 at 9. It contends that it was required to borrow money during the period of infringement at a much higher rate of 10 percent. ECF No. 296 at 15. CMI does not dispute Asetek's entitlement to prejudgment interest, but requests that the Court apply the Treasury Bill rate compounded annually because Asetek "has offered no evidence that it needed to

borrow money *because* it was deprived of the damages award." ECF No. 287 at 16 (emphasis in original).

The Court finds it reasonable to award Asetek prejudgment interest at the prime rate, compounded monthly. A patentee need not offer proof of borrowing at or above the prime rate "to be entitled to an award of prejudgment in interest at the prime rate." Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc., 862 F.2d 1564, 1579-80 (Fed. Cir. 1988); see also Uniroyal, 939 F.2d at 1545 (Fed. Cir. 1991), but there is evidence of such borrowing here. The Court considers this borrowing history, along with Asetek's prior assertions that it has not yet reached profitability. See ECF No. 194, Tr. 426:2-4; ECF No. 266 at 18. The Court also concludes that the prime rate "more nearly approximates the position Asetek would have been in had CMI entered into a reasonable royalty agreement" with CMI. A&L Tech. v. Resound Corp., No. C 93-00107 CW, 1995 WL 415146, at *5 (N.D. Cal. June 29, 1995).

### 5. Post-judgment interest

Section 1961 provides that post-judgment interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding." 28 U.S.C. § 1961.

Asetek moves the Court for post-judgment interest. ECF No. 267 at 3. The Court orders CMI to pay post-judgment interest at the statutorily-mandated rate.

### 6. Returned sales

Despite calculating damages at trial that offset CMI's sales revenues, Asetek now contends that it should receive a royalty for infringing products that were sold but returned, ECF No. 267 at 9, although it provides no basis for its position. CMI points out that Dr. Mody previously treated negative sales as offsets to total revenue in determining CMI's relevant sales. See ECF No. 288 at 15. CMI also notes that Asetek's own license with Corsair contemplates that manufactures bear the risk of the return. See ECF No. 288 at 15.

Asetek's position is not commercially reasonable. The Court agrees with CMI that

United States District Court
Northern District of California

consistent with the damages calculated by Asetek at trial, returned sales of accused products should offset sales revenues.

### 7. Ongoing royalty

Because the Court enters a permanent injunction in favor of Asetek, it need not impose an ongoing royalty rate.

### CONCLUSION

For the reasons set for above, CMI's motion for entry of judgment as a matter of law and motion for a new trial are both denied. Asetek's motion for entry of a permanent injunction is granted. Asetek's motion for supplemental damages and prejudgment interest granted in part and denied in part.

CMI is ordered to produce to Asetek's counsel, within five court days of the date of this Order, a spreadsheet similar to CMIUSA-ASE00013784 that completely and accurately reflects all of CMI USA's revenues for sales of the Infringing Products in the United States since October 1, 2014, through the date of this Order, including product returns that offset.

Asetek is ordered to submit revised calculations for supplemental damages, and pre- and post-judgment interest consistent with this Order, and a revised form of judgment reflecting the same, within seven court days of receipt of CMI's updated revenues as ordered in the preceding paragraph. For the reasons set forth elsewhere in this Order, Asetek's updated calculations may include enhanced damages, i.e., a 25.375% royalty rate, on CMI's revenues for sales of infringing products beginning January 1, 2015. Asetek shall bear in mind that "prejudgment interest can only be applied to the primary or actual damage portion and not to the punitive or enhanced portion" of the damages award. Underwater Devices Inc. v. Morrison-Knudsen Co., 717 F.2d 1380, 1389 (Fed. Cir. 1983), overruled on other grounds by In re Seagate Tech., LLC, 497 F.3d 1360 (Fed. Cir. 2007).

CMI may submit it objections, if any, to Asetek's revised form of judgment, within five court days after the judgment is submitted. CMI may only interpose objections it has not already made. Asetek may reply within five court days thereafter. The matter will then stand submitted

unless the Court schedules a hearing.

IT IS SO ORDERED.

Dated: September 22, 2015

_____
JON S. TIGAR
United States District Judge